**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| RACE TIRES AMERICA, INC., a Division of SPECIALTY TIRES OF AMERICA, INC.; SPECIALTY TIRES OF AMERICA, INC.; SPECIALTY TIRES OF AMERICA (PENNSYLVANIA), INC.: and SPECIALTY TIRES OF AMERICA (TENNESSEE), LLC, | ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | )   02: 07-cv-01294 |
| HOOSIER RACING TIRE CORP., and DIRT MOTOR SPORTS, INC. d/b/a WORLD RACING GROUP, | ) ) ) ) |
| Defendants. | ) ) |

**MEMORANDUM OPINION AND ORDER OF COURT**

September 15, 2009

Presently before the Court for disposition are the following:

•   MOTION FOR SUMMARY JUDGMENT THAT HOOSIER HAS

COMMITTED NO ANTITRUST VIOLATIONS, with brief in support, filed by Hoosier

Racing Tire Corp. ("Hoosier") (Document No. 196 and Sealed Document No. 206), joined by

co-Defendant Dirt Motor Sports, Inc. (Sealed Document No. 197-2); MEMORANDUM IN

OPPOSITION filed by Plaintiffs (Sealed Document No. 228); and the REPLY BRIEF filed by

Hoosier (Sealed Document No. 248);

•   MOTION FOR SUMMARY JUDGMENT, with brief in support, filed by

Dirt Motor Sports, Inc. d/b/a World Racing Group ("DMS") (Sealed Document No. 197 and

Sealed Document No. 199); MEMORANDUM IN OPPOSITION filed by Plaintiffs (Sealed

Document No. 227); and REPLY MEMORANDUM filed by DMS (Sealed Document No. 251); and

•    MOTION FOR PARTIAL SUMMARY JUDGMENT, with brief in support, filed by Plaintiffs (Sealed Document Nos. 202 and 204); BRIEF IN OPPOSITION filed by Hoosier (Sealed Document No. 223); and MEMORANDUM OF LAW IN OPPOSITION filed by DMS (Sealed Document No. 224).

The factual record has also been thoroughly developed via the CONCISE STATEMENT OF MATERIAL FACTS NOT IN DISPUTE filed by Hoosier (Sealed Document No. 207), PLAINTIFFS' RESPONSIVE CONCISE STATEMENT IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT FILED BY HOOSIER (Sealed Document No. 230), the CONCISE STATEMENT OF MATERIAL FACTS filed by DMS (Sealed Document No. 200), PLAINTIFFS' RESPONSIVE CONCISE STATEMENT OF MATERIAL FACTS IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT FILED BY DMS (Sealed Document No. 229); the RESPONSE TO PLAINTIFFS' "ADDITIONAL MATERIAL FACTS" filed by DMS (Sealed Document No. 250);  the PLAINTIFFS' CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR PARTIAL MOTION FOR SUMMARY JUDGMENT (Sealed Document No. 205); the RESPONSIVE CONCISE STATEMENT TO "PLAINTIFFS' CONCISE STATEMENT OF MATERIAL FACTS" filed by Hoosier (Sealed Document No. 221); PLAINTIFFS' REPLY TO HOOSIER'S RESPONSIVE CONCISE STATEMENT (Sealed Document No. 245); RESPONSE TO PLAINTIFFS' CONCISE STATEMENT OF MATERIAL FACTS filed  by DMS (Sealed Document No. 225); and PLAINTIFFS' REPLY TO DMS' CONCISE

STATEMENT OF MATERIAL FACTS (Sealed Document No. 244), as well as the voluminous exhibits submitted by all parties.

On July 14, 2009, the Court heard oral argument on the motions. For purposes of the oral argument and this Opinion only, the motions for summary judgment filed by Hoosier and DMS were consolidated.  All parties were represented by counsel who presented and argued the issues skillfully and effectively.   The matter is now ripe for disposition.

After a careful consideration of the motions, the filings in support and opposition thereto, the memoranda of the parties, the oral arguments of counsel, the relevant case law, and the record as a whole, the Motion for Summary Judgment filed by Hoosier will be granted, the Motion for Summary Judgment filed by DMS will be granted, and the Motion for Partial Summary Judgment filed by Plaintiffs will be denied as moot.

### Standard of Review

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Thus, the Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986).  The non-moving party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (*citing Liberty Lobby*, 477 U.S. at 249).  Further, the non-moving party cannot rely on unsupported assertions, conclusory

allegations, or mere suspicions in attempting to survive a summary judgment motion. *Id.* (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Distilled to its essence, the summary judgment standard requires the non-moving party to create a "sufficient disagreement to require submission [of the evidence] to a jury." *Liberty Lobby*, 477 U.S. at 251-52.

Several courts have noted that summary disposition of antitrust cases is difficult because of their inherent factual complexity and because motive and intent are paramount considerations. *See e.g.*, *Poller v. Columbia Broadcasting Sys., Inc.*, 368 U.S. 464, 473 (1962). However, complexity does not mean that summary disposition is thereby precluded or even disfavored in antitrust law. *Capital Imaging Assoc., P.C. v. Mohawk Valley Medical Assoc., Inc.*, 996 F.2d 537, 541 (2d Cir. 1993). Rather, summary judgment may be particularly important in antitrust cases to prevent lengthy and drawn-out litigation that has a chilling effect on competitive market forces. *Id.* The present motions will be considered in light of these standards.

**Procedural Background**

Plaintiffs, Race Tires, Inc., a Division of Specialty Tires of America, Inc., and Specialty Tires of America Inc., initiated this lawsuit on September 25, 2007, by the filing of a five-count Complaint against only one defendant, Hoosier Racing Tire Corp. ("Hoosier"). Plaintiffs alleged Monopolization in violation of Section 2 of the Sherman Act (Count I), Conspiracy to Restrain Trade in violation of Section 1 of the Sherman Act (Count II), Attempted Monopolization in violation of Section 2 of the Sherman Act (Count III), Conspiracy

4

to Monopolize (Count IV), and Request for A Declaratory Judgment pursuant to 28 U.S.C. § 2201 (Count V).

Less than a month later, on October 12, 2007, Plaintiffs filed an Amended Complaint in which they named Dirt Motor Sports, Inc. d/b/a World Racing Group ("DMS") as an additional defendant and included allegations specific to DMS.

On January 10, 2008, the Court entered a Case Management / Scheduling Order which established a deadline of May 30, 2008, for amending of the pleadings.  The parties engaged in discovery, which resulted in a steady stream of disputed discovery motions being filed with the Court.  At last count, the Court had ruled on at least ten (10) discovery motions.

On March 13, 2008, Plaintiffs filed a Second Amended Complaint in which two "sister companies" of Specialty Tires of America, Inc., were added as co-plaintiffs: Specialty Tires of America (Pennsylvania), Inc., and Specialty Tires of America (Tennessee), LLC.

On May 30, 2008, the actual deadline for seeking leave to amend the pleadings, Plaintiffs moved to amend their complaint a third time to add a new count which alleged a tying arrangement illegal under Section 1 of the Sherman Act.   The Court granted Plaintiffs' request for leave and a Third Amended Complaint was filed on June 23, 2008.

On November 19, 2008, well after the expiration of the deadline for amending pleadings, Plaintiffs once again sought leave to amend their Complaint to add a count alleging a concerted refusal to deal (group boycott).  Not surprisingly, Defendants strongly opposed Plaintiffs' request to amend their Complaint a fourth time.  On December 16, 2008, the Court denied the request to amend finding that Plaintiffs had failed to demonstrate good cause to amend and that it would be prejudicial to Defendants, fifteen months (15) months after the

5

lawsuit was initiated and seven (7) months after the expiration of the deadline for seeking leave to amend, to add a new claim based on an additional legal theory, which would require additional written discovery and depositions.  *See* Sealed Document No. 155.

**Background**

The history between the parties to this antitrust lawsuit is lengthy and contentious. The Court has noted on numerous occasions the considerable tension among the respective parties and their attorneys.

Plaintiffs, Race Tires America, Inc., a Division of Speciality Tires of America, Inc.; Speciality Tires of America, Inc.; Specialty Tires of America (Pennsylvania), Inc., and Speciality Tires of America (Tennessee), LLC (collectively referred to as Plaintiffs or "STA") and Hoosier compete in selling racing tires used in auto racing events sponsored or promoted by DMS, and other sanctioning bodies, race track owners, promoters, and tour series. Competition between STA and Hoosier includes vying for single tire rule contracts with sanctioning bodies.

STA alleges that Hoosier has greater than a 70% market share in the dirt oval race track market, and an even greater market share in the market for the sale of race tires in sanctioned dirt oval track races.  Third Amended Complaint, at ¶ 18.  STA contends that Hoosier acquired and maintained its monopoly power by entering into anticompetitive exclusive dealing agreements with sanctioning companies and with individual track owners / promoters.

Plaintiffs allege that sanctioning companies, in exchange for payments from Hoosier, have adopted and promulgated "Hoosier-only" tire(s) rules, pursuant to exclusive dealing agreements with Hoosier.  According to Plaintiffs, these Hoosier-only tire(s) rules foreclose competition in a substantial portion of each of the categories of cars that compete in dirt oval track racing.  Plaintiffs contend that there is no legitimate business justification for the exclusive Hoosier-only single tire(s) rules.

DMS is one of three major sanctioning companies in dirt oval track racing; the other two are International Motor Contest Association ("IMCA") and WISSOTA Promotions, Inc. ("WISSOTA").  According to Plaintiffs, these three sanctioning companies sanction modified, late model, sprint, or stock car races at over 70% of the 636 weekly tracks in the United States. Third Amended Complaint, at ¶ 37.  DMS sanctions over 5,000 races per year at over 200 dirt oval tracks in twenty-one (21) states; IMCA sanctions races at approximately 112 dirt oval tracks; and WISSOTA sanctions races at approximately 57 dirt oval tracks.  *Id.* at ¶¶ 35-36.

DMS is the only sanctioning company named as a defendant in this lawsuit.

A.      The Parties

Plaintiff Specialty Tires of America, Inc. ("Speciality") is a Pennsylvania corporation with its principal place of business and manufacturing facility in Indiana, Pennsylvania. Plaintiff Race Tires America, Inc. ("RTA") is a division of Specialty that designs, develops, markets and sells race tires which are manufactured by Speciality, Specialty Tires of America (Pennsylvania) and Speciality Tires of America (Tennessee) LLC.  Plaintiffs (collectively

referred to as "STA") are wholly-owned subsidiaries and part of the "tire division" of parent corporation Polymer Enterprises, Inc., a Delaware holding company.

STA manufactures and sells speciality tires, including but not limited to, tires for use in light aircraft, industrial handling equipment, mining equipment, farm and agriculture equipment, medium and heavy duty trucks, all terrain vehicles ("ATV"),  light trucks, off the road equipment, bias ply passenger tires, and the military.

STA manufactures and sells its "house brand" racing tire known as the American Racer through its division RTA.  American Racer tires include what STA denotes as dirt track racing and asphalt track racing tires, ATV racing tires, passenger performance tires, and race track equipment tires.  STA also manufactures private label racing tires sold under the brand names Mickey Thomson, Burris, Morosso, Sand Tires, Unlimited; and Malibu Grand Prix. Most of these tires are not sold through STA's RTA division.

Defendant Hoosier is a family-owned business headquartered and located in Indiana. Hoosier focuses its business almost exclusively on selling racing tires.  Hoosier tires are manufactured at a single facility in Lakeville, Indiana, by its sister company, Hoosier Tire & Rubber Corp.  Hoosier is the largest race tire manufacturer in the world that specializes in manufacturing racing tires.

Defendant DMS is a motor sports sanctioning body and motor sports event company. DMS is a Delaware corporation with its principal place of business in Concord, North Carolina. DMS operates race tracks and owns such racing touring series as the World of Outlaw Sprint Car Series and Late Model Series.  In 2005, DMS acquired United Midwest Promoters ("UMP"), another sanctioning body.  UMP sanctions late model touring series and races at

tracks, as well as modified weekly racing.  UMP had a "Hoosier only" rule for years, which has continued under DMS's ownership.

B.       Sanctioning Bodies in the Motor Sport Industry

Most dirt oval tracks are owned or leased by owners / promoters, who own or lease the dirt oval tracks and organize and conduct the races.  Most track owners / promoters are members of a "sanctioning body" for at least one class of cars at their track.   A sanctioning body is an organization that formulates and promulgates rules that govern the races which they sanction.  Sanctioning bodies compete to attract race car drivers ("drivers") and fans to their races.  In order to give the participants at its track the best opportunity to demonstrate their skills and encourage participation, a promoter or sanctioning body must provide a level playing field for the competitors.

The owners / promoters pay a sanctioning fee to the sanctioning body.  It is desirable for track owners / promoters to be members of a sanctioning body because the sanctioning body creates incentives for drivers to drive in the races that they sanction.  These incentives include enabling drivers to accumulate points, both nationally and regionally, race publicity, guarantee purses for the winning drivers, and the promulgation of rules familiar to the race drivers.

Sanctioning bodies often choose to utilize a "single tire rule," which requires that a specific tire type and brand be used on one or more wheel positions (i.e., right-and left-front, right-and left-rear) for one or more classes of cars for a series of races or racing seasons (e.g., "sprint cars," "modifieds," "hobby stocks," "sports compacts").

Relevant to this lawsuit is the fact that sanctioning bodies generally do not buy tires themselves, but rather establish the parameters of the type of tire that may be used in a race. Some rules may define the permissible tire by merely a bead size or other physical dimension; others may require that the tires at one or more wheel locations be a particular type or brand of tire.

Tire rules that do not require a specific brand of tire are called "open tire rules." Among the many decisions sanctioning bodies make in promulgating their rules are whether a particular race should have an open tire rule or a single tire rule (or some combination thereof). For example, DMS has adopted a Hoosier tire rule for most of its race tracks and series, but DMS utilizes an "open tire rule" for some of its World of Outlaw races.

A sanctioning company determines what tire rules to run for its various races and makes this decision based on its own self-interest, including how best to market its races. A sanctioning body may decide that it wants a single tire rule for all or most categories of its races.

Tires are not the only components of a race car subject to a single source or manufacturer rule. Sanctioning companies make rules that may specify, along with tires, carburetors, mufflers, or even the entire chassis. For example, USAC has a spec engine rule for its Ford Focus Midget Series, which requires that only Ford engines may be used. URC has a rule requiring a single brand of cylinder heads, the manufacturer of which is also a sponsor for URC. The International Race of Champions Series Racing, a series of ten (10) races in which the premier drivers from IRL, NASCAR's Busch Series, and NASCAR's cup series, specified that the racers would each run on identical cars.

10

C.        Single Tire Rules and Exclusive Agreements

STA has supported single tire rules generally and believes that single tire rules have

significant benefits for racing.[1]  STA states on its website that it developed and promoted the

concept of a "single tire" rule more than thirty (30) years ago to help sanctioning bodies create

parity among drivers and prevent "tire wars" between competing tire manufacturers:

> In the 1970's, Joe Jacobs, the developer of the race tire business that
> eventually became Race Tires America, proposed and encouraged race
> tracks and promoters to adopt spec tire or track tire rules.  Under this
> concept, track owners and promoters adopted a manufacturer's tire for a
> particular class of races for the duration of a racing season.  The purpose of
> the rule was to avoid the almost constant pace of tire changes that were
> particularly costly to racers, and to encourage racer parity by removing the
> "hot" tire setups.  With all racers competing on a single tire design and
> compound, the tire wars would be quelled and race results would be more
> related to a driver's skill and ability and not a more expensive "state-of-
> the-art" tire.  The acceptance of spec tire rules contributed to the success
> and popularity of dirt track racing in America.

Sanctioning bodies make the decision to choose a single entity to supply tires and

decide to have a tire rule.  A sanctioning body may decide to send a formal Request for

Proposal ("RFP") to multiple suppliers.

Sanctioning bodies typically require the tire supplier to provide promotional

sponsorship contributions, including "point funds" that generally supplement the funds paid to

winning drivers at the end of the year and/or "promotional funds," which are not point funds

and which may be used in whatever manner the sanctioning organization chooses.  However, a

---

[1]        STA admits this statement, but clarifies that this "statement refers to track rules that
are in effect for a single, one year racing season.  By contrast, the present litigation
involves exclusive contracts . . ., which involve major sanctioning companies,
encompass thousands of races, and last for periods of up to five to seven years. . . ."
Pl's Responsive Concise Stmt of Mat. Facts, at ¶ 30 (Sealed Document No. 230).

sanctioning body may decide to seek lower or no point funds and instead request a less expensive tire.

If a sanctioning body is satisfied with its current tire supplier, it may elect to stay with that supplier rather than solicit bids from other suppliers. Other tire suppliers are generally aware that a contract exists and could seek to compete for the business if they wanted it. Tire suppliers can and do take sanctioning body business away from one another.

STA argues that Hoosier's exclusive single tire contracts foreclose competition in dirt oval track races.

STA distributors also bid on exclusive contracts and offer money in exchange for a rule which would require drivers to use an American Racer tire. Even after the filing of this lawsuit, STA's distributors have continued to bid on exclusive tire supplier contracts. For example, Lias Tire, a STA distributor, has an exclusive agreement with URC, a sanctioning company, which requires the use of American Racer tires. Lias Tire agreed to pay URC $14,500 to be the single tire at approximately thirty (30) events. STA admits that it has not told its distributors to stop making such exclusive deals or to refrain from giving promotional money in exchange for exclusivity.

Hoosier has identified over seventy (70) exclusive contracts that it or its distributors have entered into with sanctioning companies since 2003. However, in this litigation, STA focuses primarily on five (5) sanctioning bodies that have chosen to have a single tire rule and have selected Hoosier over STA, *to wit*: International Motor Contest Association ("IMCA"),

WISSOTA Promotions, Inc. ("WISSOTA");  American Spring Car Series ("ASCS"), the

United States Auto Club, Inc. ("USAC"), and DMS.[2]

      (a)    IMCA is a sanctioning body with offices in Vinton, Iowa, that sanctions races

in the Midwest on both dirt and asphalt surfaces.  From the 1980s to approximately 2005,

IMCA has required its racers to exclusively use the G-60 American Racer tire manufactured by

RTA.  According to Plaintiffs, there were no terms to the agreement with IMCA and the

agreement had no specific duration.  In December 2004, IMCA sent a RFP to STA, Goodyear,

and Hoosier for an exclusive contract of three years duration.[3]   Hoosier's bid proposed a five

year contract in which Hoosier would be the exclusive tire in every IMCA class of cars.  STA

lost its bid to continue its exclusive agreement with IMCA to Hoosier.   In 2005, Hoosier

entered into a five-year exclusive contract, which continuously renews, with IMCA to sell

IMCA plated G60-15 tires to drivers for certain classes of races in which Hoosier agreed to

limit future tire price increases and to pay IMCA a signing bonus and point funds.

      Although STA lost its exclusive agreement with IMCA, it still continues to sell its G-

60 American Racer tire to tracks that are not sanctioned by IMCA.  In addition, at least one

track chose to drop its IMCA sanction so that it could still use the G-60 American Racer tire as

its exclusive tire.

---

[2]     Currently, the competitors in the dirt oval track race tire market are Hoosier, Goodyear, and STA.  In the late 1980s and 1990s there were at least five tire manufacturers competing in the dirt oval track market: Hoosier, Firestone, Goodyear, M&H, and STA (then called McCreary).

[3]     Plaintiffs state that it "was the default sole supplier to IMCA because RTA was the only company that made the G-60 tire."  Pl's Responsive Concise Stmt of Mat Facts, at ¶ 57 (Sealed Document No. 230).

(b)    <u>WISSOTA</u> is a sanctioning body with its primary place of business in Minnesota.  WISSOTA sanctions races in Wisconsin, Minnesota, North and South Dakota, Wyoming, Montana, and Canada.  From 2001 through 2007, WISSOTA and Hoosier Tire North, a Hoosier distributor, had an exclusive agreement.  In October 2006, WISSOTA sent out RFPs to STA, Hoosier, and Goodyear.

The WISSOTA board of directors met on July 27, 2007, to review the bids and select its exclusive tire supplier for the next three (3) years.  STA's proposal was submitted through its distributor, Boubin Tire & Automotive; Hoosier made its proposal directly.  STA offered a lower tire price than Hoosier and did not propose a point fund to WISSOTA.  Hoosier offered a higher tire price, but also offered a high point fund contribution.  The board decided to accept the Hoosier proposal.

Terry Voeltz, WISSOTA's president, testified in his deposition that the lower-priced tire offered by STA actually turned out to be the same price as the Hoosier tire over the course of the contract period when taking into account STA's higher price escalation.  *See* Voeltz Depo, at 178-79.  Terry Voeltz testified as follows:

> [W]e would have went with American Racer in a heartbeat if they would - if they would have brought it and - and had the bid that - that deserved the bid.  I - I can tell you right now - that I personally would have bet money that we were going to have a new tire dealer and it was going to be American Racer, because I thought the bids were going to come in substantially different than they did.  And I believe everybody in the room thought so.

(c)    <u>ASCS</u> is a sanctioning body headquartered in Tulsa, Oklahoma, and runs sprint cars in several regional touring series and a national series.  In 2007, STA recognized the potential to become the exclusive supplier for right rear tires for ASCS 360 sprint cars.

14

Although there was no "request for proposal" procedure, STA met with and submitted a proposal to ASCS, in which STA offered a financial contribution in exchange for exclusivity. ASCS chose to remain with its Hoosier-only rule for the right-rear wheel position.

(d)      USAC is a sanctioning body headquartered in Indianapolis, Indiana, which sanctions about 280 races per year, primarily in the Midwestern and Western United States. USAC sanctions three (3) types of sprint car races on both dirt and asphalt tracks. In 2003, USAC decided to implement a right rear single tire rule for certain classes of sprint races and sent out a RFP to STA, Goodyear, and Hoosier.  STA submitted a proposal that stated that for two (2) classes of cars in the proposal (USAC midgets and sprint cars), the tire business would be "split between various suppliers."  STA did not propose exclusivity for the "Silver Crown" series.  Goodyear and Hoosier also submitted competing bids, and Hoosier won the contract.

(e)      DMS.  In 1994, STA's distributor, Lias Tire, won the bid to be DMS's exclusive tire supplier for its "Big-Block" and "358" modified races.  Hoosier then "outbid" STA in 1995 and became the exclusive tire provider.  Lias Tire has not bid on a contract with DMS since 1995.  DMS and Hoosier have had an exclusive relationship since 1995 for Hoosier to be the tire supplier for many of the races which DMS sanctions.

Hoosier has the following exclusive contracts with DMS which mandate that the drivers use only Hoosier tires: (i) exclusive tire contract for UMP Modifieds and other classes for 2007-2008; (ii) exclusive tire contract for DIRT Northeast Big Block Modified for 2007-2008; (iii) exclusive tire contract for World of Outlaw National Sprint Series for 2007-2009; and (iv) exclusive tire contract for UMP Late Models for 2008-2010.

In October 2007, after the filing of this lawsuit, DMS sent a RFP to seven tire manufacturers, including Goodyear, Hoosier, and STA, requesting proposals for a one year contract to be the exclusive supplier for the UMP DIRTcar Late Model series.   Of the seven companies who were sent a RFP, only three - Goodyear, STA, and Hoosier - responded with proposals.  STA's proposal advocated "non-exclusivity;" the Hoosier and Goodyear bids each advocated exclusivity.  DMS did not select STA's proposal, but rather awarded Hoosier with an exclusive tire contract for the UMP DIRTcar Late Model series for a three year racing period, 2008, 2009, and 2010.

In October 2008,  DMS sent a RFP to seven companies requesting proposals for a contract to be the exclusive tire supplier for DIRTcar Modified (NE) racing.  Of the seven companies who were sent a RFP, only three - Goodyear, Hoosier, and STA, responded with proposals.  Goodyear and Hoosier each submitted proposals that were responsive in that the proposals submitted by Goodyear and Hoosier addressed each of the material business terms in the RFP.  In contrast, DMS deemed STA's proposal as non-responsive because it contemplated a non-exclusive relationship although the RFP called for a proposal of an exclusive arrangement.

DMS determined that STA would not be selected as the exclusive tire supplier for DIRTcar Modified (NE) racing for the 2008, 2009, and 2010 racing seasons.  As between Goodyear and Hoosier, DMS ultimately determined that the Hoosier proposal best fit DMS's goals and objectives, and awarded the contract to Hoosier for DIRTcar Modified (NE) racing for the 2008, 2009, and 2010 racing seasons.

16

D.        The Sprint Car Summit

In July 2006, DMS and its competitors - other sanctioning companies, promoters and track operators that sanctioned sprint car racing - held a "Sprint Car Summit" to address the decline in car counts and fans at 410 sprint car races.  Sprint car races are more likely to be "touring" races.[4]  Consideration of single tire rules, among other things, was discussed as an option to try to regenerate interest in sprint car racing.  Also discussed was the issue of improvements to sprint car tires.

STA was not invited to the meeting; Hoosier was initially invited, but  DMS later withdrew the invitation.  After the meeting, DMS executives met with Hoosier representatives, but did not meet with any other tire manufacturer. At this meeting, DMS and Hoosier discussed the possibility of entering into an exclusionary contract to make Hoosier the exclusive sprint car tire supplier for sprint car races.

Thereafter, Hoosier entered into exclusive dealing agreements with sanctioning body competitors (tracks and touring series) who sanctioned sprint race car touring series, which provided exclusive, automatically renewing contracts with Hoosier for the right rear tire of sprint cars for dirt oval track racing.[5]  Under such exclusive dealing agreements, Hoosier pays

---

[4]      Unlike a regular weekly race at a particular track, a "touring race" will travel to different tracks around the country.  Touring races attract "local" or non-touring drivers to participate in the race, as well as the core group of "touring series" drivers.  These touring series draw racing fans by showcasing well-known drivers and promoting rivalry between these well-known drivers and challengers.  Third Amended Complaint, ¶ 39.

[5]      According to STA, the "right rear" tire position is important because dirt oval track races are run counter-clockwise, and the right rear tire is the tire that takes the most wear and, thus, requires, the most frequent replacement.  The right rear tire is

(continued...)

the sanctioning company or the owner / promoter in exchange for the promulgation and enforcement of a Hoosier-only tire rule for that race.

On December 15, 2006, Hoosier issued a press release in which it announced that it had developed a "national sprint spec tire" and that the new tire would be "available in three compounds."

STA alleges that since the December 15, 2006, Hoosier announcement of its "national spec tire" for right rear sprint car tires, and since Hoosier entered in to the agreements for the sprint car tires, STA's sales of right rear sprint car tires have dropped approximately ninety-five percent (95%).

### Discussion

STA alleges that Defendants have violated Sections 1 and 2 of the Sherman Act. STA contends that the "single tire rules" and related exclusive contracts between Hoosier and DMS for the supply of race tires at certain races sanctioned by DMS violate antitrust laws. Defendants argue that they are entitled to summary judgment as a matter of law because STA has suffered no antitrust injury as a result of the Hoosier-only tire rules. According to Defendants, there have been no violations of any antitrust laws when Hoosier's rivals simply can not provide the sanctioning companies with a comparable economic incentive to switch tire suppliers. Defendants also contend that the undisputed summary judgment record evidence demonstrates that no sanctioning company is being coerced to have a single tire rule and that no

---

[5](...continued)
typically the most expensive tire.  Third Amended Complaint, at ¶ 58.

sanctioning company, including DMS, is being coerced to select Hoosier.  Further, Defendants

argue that the undisputed summary judgment record evidence does not demonstrate that

Hoosier and DMS have entered into an illegal conspiracy in violation of antitrust laws.

STA filed a cross motion for partial summary judgment on Defendants' affirmative

defenses of "unclean hands" and "in pari delicto."

A.      **Statutory Framework**

1.      Section 1 of the Sherman Antitrust Act

Section 1 of the Sherman Act provides that "every contract, combination in the form

of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared to be

illegal."  15 U.S.C. § 1.  Although this language may suggest a broad restriction on commercial

restraints, the United States Supreme Court repeatedly has made clear that this provision covers

only <u>unreasonable</u> restraints of trade.  *See National Collegiate Athletic Ass'n v. Board of*

*Regents*, 468 U.S. 85, 98 n. 17 (1984) (explaining that "every contract is a restraint of trade,

and as we have repeatedly recognized, the Sherman Act was intended to prohibit only

unreasonable restraints of trade") (collecting cases); *Rossi v. Standard Roofing*, 156 F.3d 452,

462 (3d Cir. 1998).

In determining whether a defendant's conduct unreasonably restrains trade in

violation of section 1 of the Sherman Act, courts generally apply one of two analytical methods,

depending on the nature of the concerted action at issue.  *Rossi*, 156 F.3d at 461.  Courts

examine agreements using either (a) the so-called "rule of reason" analysis, "whereby the fact

finder 'weighs all of the circumstances of a case in deciding whether a restrictive practice

should be prohibited as imposing an unreasonable restraint on competition', " or (b) by

applying a per se rule, which dispenses with the need for case-by-case analysis. *Id.*[6]

In actions involving a vertical restraint, which the parties agree is the situation in the

present case, courts apply the "rule of reason" analysis. *Cont'l T.V., Inc. v. GTE Sylvania, Inc.*,

433 U.S. 36, 50 (1977); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1368 (3d Cir. 1996).

"In order to survive summary judgment in cases where [the rule of reason] applies, the plaintiff

must show concerted action, antitrust injury, evidence that the conspiracy produced adverse,

anti-competitive effects within the relevant product and geographic markets, and evidence that

the objects of and the conduct pursuant to the conspiracy were illegal." *Intervest, Inc. v.

Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003) (internal quotations and citation omitted).

The rule of reason inquiry focuses on the competitive significance of the restraint:

> The true test of legality is whether the restraint imposed is such as merely
> regulates and perhaps thereby promotes competition or whether it is such
> as may suppress or even destroy competition. To determine that question
> the court must ordinarily consider the facts peculiar to the business to
> which the restraint is applied; its condition before and after the restraint
> was imposed; the nature of the restraint and its effect, actual or probable.
> The history of the restraint, the evil believed to exist, the reason for
> adopting the particular remedy, the purpose or end sought to be attained,
> are all relevant facts.

---

[6] In addition, the United States Court of Appeals for the Third Circuit has recognized a third standard that falls somewhere between the rule of reason analysis and a per se rule. *Rossi,* 156 F.3d at 461. The court of appeals refers to this middle ground as an abbreviated or "quick look" rule of reason analysis. *Id.* (*citing Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1367 n.9 (3d Cir. 1996); *United States v. Brown Univ.*, 5 F.3d 658, 669 (3d Cir. 1993)). This "quick look" analysis "applies where per se condemnation is not appropriate, but where a full-blown industry analysis is not required to demonstrate the anticompetitive character of an inherently suspect restraint." *Id.*

*Orson,* 79 F.3d at 1367 (quoting *Board of Trade of Chicago v. United States*, 246 U.S. 231, 238 (1918)).

The plaintiff may satisfy this burden by showing (i) actual anticompetitive effects or (ii) demonstrating proof of the defendants' market power, i.e., the ability to raise prices above those that would exist in a competitive market.  *Id.*  Only if a plaintiff meets this initial burden does the burden shift to the defendant to show business justification for the challenged conduct. *Id.* at 1367-68.

2. <u>Section 2 of the Sherman Antitrust Act</u>

Section 2 of the Sherman Antitrust Act sanctions those "who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations."  15 U.S.C. § 2.

> The offense of monopoly under § 2 of the Sherman Act has two elements:
> (1) the possession of monopoly power in the relevant market and (2) the
> willful acquisition or maintenance of that power as distinguished from
> growth or development as a consequence of a superior product, business
> acumen, or historic accident."

*Eastman Kodak C. v. Image Technical Services, Inc.* 504 U.S. 451, 481 (1992) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71(1966)).

The United States Supreme Court has explained that there are generally three required elements for the offense of attempted monopoly under section 2:

> [I]t is generally required that to demonstrate attempted monopolization a
> plaintiff must prove (1) that the defendant has engaged in predatory or
> anticompetitive conduct with (2) specific intent to monopolize and (3) a
> dangerous probability of achieving monopoly power.

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).  With respect to the third

element, in order to prove whether there is a dangerous probability of monopolization, a court

must inquire "into the relevant product and geographic market and the defendant's economic

power in that market." *Id.* at 459.

Section 2 is violated only when there is "conduct which unfairly tends to destroy

competition itself."  Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 458 (1993).  "[A]

practice is not 'anticompetitive' simply because it harms competitors . . . . Rather, a practice is

'anticompetitive' only if it harms the competitive process*." Mumford v. GNC Franchising*

*LLC*, 437 F. Supp.2d 344, 354 (W.D. Pa. 2006) (citations omitted).

If the challenged conduct is not in itself unlawful, the courts must conduct a more

thorough balancing analysis of the pro- and anti-competitive effects of the challenged behavior.

Indeed, the analysis applied is much the same reasonableness standard as that conducted under

a section 1 analysis.

A "dangerous probability" of the defendant's ultimate success in achieving a

monopoly - or lack thereof - is assessed by considering the relevant market, the defendant's

market share, entry barriers, and other direct or circumstantial evidence bearing upon the

likelihood that if the defendant's conduct continues, the defendant will achieve actual

monopoly power to control prices and exclude competition.

Market share is not all determinative, however, and may be offset by other evidence

bearing upon such competitive conditions within the industry, such as proof that the market

remains highly competitive, that the defendant controls key materials or technology, and the

presence or absence of other barriers to new market entry or expansion by existing competitors.

22

*See, e.g., U.S. v. Microsoft Corp.,* 253 F.3d 34, 53 (D.C. Cir. 2001) (reversing findings that

Microsoft had attempted to monopolize an alleged market for internet browser software, where

the government failed to either properly define the relevant market or to demonstrate the

presence of substantial barriers to entry.").

3.      Antitrust Damages

A private plaintiff is not required to prove exactly and with total certainty the amount

of antitrust damages which it has sustained, if that plaintiff clearly demonstrates that the

defendant's antitrust violations caused its antitrust injury.  However, if a plaintiff has suffered

financial loss from the <u>lawful</u> activities of a competitor, then no damages may be recovered

under the antitrust laws.  It is a requirement that an antitrust plaintiff must prove that its

damages were caused by the unlawful acts of the defendant.  *See* 15 U.S.C. § 15. This is the

essence of "antitrust injury" as set forth by the United States Supreme Court in *Brunswick*

*Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

The requisite antitrust injury requires: "(1) harm of the type the antitrust laws were

intended to prevent; and (2) an injury to the plaintiff which flows from that which makes

defendant's acts unlawful."  *Gulfstream III Assocs. Inc. v. Gulfstream Aerospace Corp.*, 995

F.2d 425, 429 (3d Cir. 1999) (*citing Brunswick*, 429 at 477 and *Int'l Raw Materials, Ltd. v.*

*Stauffer Chem. Co.*, 978 F.2d 1318, 1327-28 (3d Cir. 1992)).

B.        **Antitrust Claims Brought Against Hoosier and DMS**

STA alleges that Hoosier has conspired to restrain trade by entering into exclusive

contracts (Count II) and that its contracts constitute an illegal tying arrangement (Count VI).

STA also alleges that Hoosier has attempted to monopolize (Count III), conspired to

monopolize (Count IV), and "has willfully acquired, used and maintained its monopoly power

in the relevant market" by entering into exclusive dealing agreements (Count I).


1.        Relevant Market

An antitrust plaintiff has the burden of defining the relevant market.  *Queen City*

*Pizza, Inc. v. Domino's Pizza, Inc*., 124 F.3d 430 (3d Cir. 1997).  The boundaries of a product

market are determined by the reasonable interchangeability of use or the cross-elasticity of

demand between the product itself and substitutes for it.  *See Queen City Pizza,* 124 F.3d at

436-38.  In this case, the relevant market analyses required under section 1 and section 2 of the

Sherman Act are the same because STA's claims under both sections relate to the Hoosier only

single tire rule.

STA alleges a "market for the sale of racing tires that race on dirt oval tracks in the

United States and Canada" that includes "four categories of cars that are the most popular" and

various "classes of cars in each category."  Third Amended Complaint, at ¶ 6.

STA also alleges "a separate and distinct market for the sale of racing tires in

'sanctioned races' within the [larger] dirt oval track market."  *Id.* at ¶ 10.  Both Hoosier and

DMS object to such a narrowly-tailored separate market and argue that such a definition would

not withstand economic analysis.

Furthermore, Defendants argue that even accepting STA's proposed broader market as they have articulated it, STA's claims fail without reference to any market because where the sanctioning body chooses its preferred supplier according to its rules, antitrust concerns are simply lacking.

For the purpose of this Memorandum Opinion only, the Court will accept STA's broader definition of relevant market as set forth in Paragraph 6 of the Third Amended Complaint, *to wit*: a "market for the sale of racing tires that race on dirt oval tracks in the United States and Canada" that includes "four categories of cars that are the most popular" and various "classes of cars in each category."

2.    <u>Exclusive Dealing Agreements</u>

Exclusive dealing agreements can violate the antitrust laws if they have a coercive element that produces an adverse effect on competition.  However, exclusive supply contracts are routinely held by courts to not violate the antitrust laws.  *See, e.g., Apani Southwest, Inc. v. Coca-Cola Enters.*, 300 F.3d 620, 627 (5th Cir. 2002) (holding marketer did not violate antitrust laws by entering into exclusive agreement with city to sell bottled water for ten (10) years); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1435, 1370 (3d Cir. 1996) (holding film distributor's exclusive licensing agreement with theater not unlawful where film distributor had sufficient business justifications and agreement was not anticompetitive); *Ca. Dental Asss'n v. F.T.C.*, 224 F.3d 942 (9th Cir. 2006) (holding trade association's rules not illegal where no negative impact on competition and rules had demonstrated pro-competitive benefits).

Similarly, courts have repeatedly recognized the benefits of exclusive dealing contracts.  In fact, the United States Court of Appeals for the First Circuit held that such contracts are "not disfavored by the antitrust laws."  *Eastern Food Servs., Inc. v. Pontofical Catholic Church Univ. Servs. Ass'n, Inc.*, 357 F.3d 1, 8 (1st Cir. 2004) (stating that exclusive dealing contracts are not disfavored by antitrust laws and ordinarily pose threat to competition only in very discrete circumstances); *see also Barr Labs, Inc. v. Abbott Labs.,* 978 F.3d 98, 110-11 (3d Cir. 1992) (recognizing the "existence of legitimate business justifications for the [exclusive dealing] contracts also supports the legality of the global contracts"); *Apani*, 300 F.3d at 627 (ten year exclusive contract upheld as lawful).  "Rather, it is widely recognized that in many circumstances [exclusive dealing] may be highly efficient - to assure supply, price stability, outlets, investment, best efforts or the like."  *Eastern Food Servs.*, Inc., 357 F.3d at 8.

STA argues that Hoosier's exclusive single tire contracts foreclose competition in dirt oval track racing tires.  In support of this argument, STA relies on the following undisputed facts:

- Hoosier's exclusive contracts obligate the sanctioning companies and tracks to "ensure that Hoosier tires are the only tires used in competition" by racers;

- Hoosier has form contracts that it provides to its distributors for use in securing "Hoosier only" rules from sanctioning bodies and tracks;

- the contracts with the sanctioning companies are drafted by Hoosier;

- the form contracts provide that Hoosier will pay "promotional fees" to the sanctioning company;

- many contracts provide for a duration of multiple years and the duration is proposed by Hoosier; and

- many contracts have "evergreen" clauses that "automatically renew" before the racing season ends.  If the contract is not renewed, Hoosier does not guarantee the end of year point fund.

Moreover, STA argues that in long term exclusive relationships, Hoosier exerts undue influence so the sanctioning bodies must "choose" to renew exclusive contracts with Hoosier.

A fundamental flaw in STA's argument, however, is that STA has failed to produce record evidence which demonstrates that Hoosier has engaged in coercive measures which has prevented STA from entering into its own exclusive single tire contracts.  The record evidence reflects that for many years sanctioning bodies have adopted single tire rules, in which racers participating in their events are required to use a single type or brand of tire.

The record also reflects that many sanctioning companies believe that single tire rules ensure equal access to a uniform product, lead to increased safety, and lower the costs of tires to the drivers by eliminating the so-called "tire wars."

Further, the record reflects that sanctioning bodies go through several steps when deciding whether to adopt a single tire rule and, if so, which brand to select.  First, the sanctioning body decides what the rules of its race will be, including its tire rule, which may be an open tire rule, a single tire rule, or some combination of the two.  Next, the sanctioning body may talk to suppliers about their willingness to provide tires or may send out a formal RFP to the manufacturers or their distributors.  Last, the sanctioning body selects the manufacturer or

distributor to provide the required tires.  In making this decision, the sanctioning body may take into account both the quoted price of the tire and the point fund and promotional fees the manufacturer or its distributor is offering.

However, what is absent from the record is any evidence that a supplier, including STA, or a distributor, including STA's distributor(s) is prevented from (i) calling on the sanctioning bodies and urging that the next contract be awarded to that supplier or from otherwise promoting its product or (ii) making its own proposals for an exclusive contract.

The summary judgment record demonstrates that the sanctioning bodies clearly want single tire rules, and that both Hoosier and STA compete to have their tires selected. Competition to become the exclusive supplier "is a vital form of rivalry, and often the most powerful one, which the antitrust laws encourage rather than suppress."  *Menasha Corp. v. News America Marketing In-Store, Inc*., 354 F.3d 661, 663 (7th Cir. 2004).  Accordingly, the Court finds and rules that where, as here, a sanctioning body <u>freely</u> decides to adopt a single tire rule, and then <u>freely</u> selects a supplier, no antitrust violation is present as a matter of law - either under Section 1 or Section 2 of the Sherman Act.

C.   <u>STA has not suffered an "Antitrust Injury" and, thus, does not have standing to bring this action</u>

Defendants argue that STA lacks standing to bring this action because STA cannot demonstrate that it has sustained an "antitrust injury," which requires that the injury be "causally linked to an illegal presence in the market." *Brunswick* , 429 U.S. at 489.  STA responds that "[t]he harm in this case is from the reduction in competition on price and quality, and the restriction of consumer choice, through an entrenched monopolist's maintenance of

market power. . . . Exclusion is the harmful effect in this case." Br. at 18 (Sealed Document No. 228).

Defendants respond that the only "injury" STA has suffered is exclusion, which is the inevitable result of competition for exclusive contracts. The Court agrees.

STA admits that sanctioning bodies make the decision to enter into exclusive contracts in their best interests. The record evidence demonstrates that the sanctioning bodies decide whether to adopt a "single tire" rule; that the sanctioning bodies determine which tire supplier to select to provide the tire; and that, significantly, for many years, STA not only promoted this system, but has competed for, and in many instances, has become the tire supplier for races in which the sanctioning body chose to have a single tire rule.

Additionally, the summary judgment record demonstrates that the sanctioning bodies want a single source for its race tires and that the tire manufacturers have competed and complied with this requirement.

The Court finds and rules that the summary judgment record demonstrates that the competition to be the exclusive supplier creates a competitive market in which STA has successfully competed rather than creates an anticompetitive market. Accordingly, the Court finds as a matter of law that there is no antitrust injury to STA when it loses the competitive battle to be the exclusive supplier. "Clearly not a victim of antitrust injury is the exclusive dealing partner whose business relationship was terminated in favor of a different exclusive dealing partner." *NicSand*, 507 F.3d at 456. As the United States Supreme Court held, there must be injury to competition, not just to a competitor, to state a claim for antitrust injury. *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998); *see also Cargill, Inc. v. Montfort of*

*Colorado*, 479 U.S. 104, 116 (1986) ("The kind of competition that [plaintiff] alleges here, competition for increased market share, is not activity forbidden by the antitrust laws.").

Here, STA's antitrust claims are built on allegations that the Hoosier exclusive tire contracts restrain trade.  STA, however, has not demonstrated that Hoosier has imposed any restraints on trade.  Further, STA has not demonstrated that Hoosier engaged in coercive measures which resulted in either STA being excluded from bidding on contracts with the sanctioning bodies or that DMS was coerced into entering the Hoosier exclusionary contracts.  The summary judgment record also contains no indication that the sanctioning bodies, including DMS, felt any economic coercion to enter into exclusive contracts with Hoosier.  Rather, the evidence reflects that the Hoosier contracts are willingly entered into by two sophisticated parties.  The Court finds and rules that Plaintiffs have failed to demonstrate that Hoosier's conduct has resulted in the presence of unlawful substantial barriers which have foreclosed Plaintiffs from bidding and winning the highly sought-after exclusive tire contracts.

The evidence from all of the sanctioning bodies that have given deposition testimony in this case reflects that for many years sanctioning bodies have adopted single tire rules.  The sanctioning bodies that utilize single tire rules believe that they enhance the races by creating more exciting races.  The sanctioning bodies also believe that the single tire rules ensure equal access to a uniform product, lead to increased safety, and lower the costs of tires to the racers by eliminating the "tire wars."[7]

---

[7]    While Plaintiffs disagree that the single tire rules ensure equal access to a uniform product, lead to increased safety and lower the costs of tires, Plaintiffs cannot deny that various representatives of the sanctioning bodies testified that single tire rules resulted in these results.  The Court finds that there is not sufficient disagreement to

(continued...)

The Court finds and rules that, based on the summary judgment record evidence, no reasonable factfinder could conclude that Defendant Hoosier has engaged in coercive behavior in violation of the antitrust laws.  Further, the Court finds and rules that, based on the summary judgment record evidence, no reasonable factfinder could conclude that Hoosier and DMS have entered into any conspiracy to restrain trade in violation of the antitrust laws.

## Conclusion

As discussed at length *supra,* the Court finds and rules that Plaintiffs have not demonstrated that they have sustained an antitrust injury because the summary judgment record is devoid of any evidence which demonstrates that Plaintiffs losses were "of the type the antitrust laws were intended to prevent" and that any injury to Plaintiffs "flows from that which makes Defendants' acts unlawful."  Gulfstream III, 995 F.2d at 429.  Accordingly, the motions for summary judgment filed by Defendants Hoosier Racing Tire Corp. and Dirt Motor Sports, Inc. d/b/a/ World Racing Group will be granted.  Plaintiffs' Motion for Partial Summary Judgment will be denied as moot.

An appropriate Order follows.


McVerry, J.

---

[7](...continued)
require submission of the evidence to a jury.  *See Liberty Lobby*, 477 U.S. at 251-52.

31

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

RACE TIRES AMERICA, INC., a Division )
of SPECIALTY TIRES OF AMERICA, INC.; )
SPECIALTY TIRES OF AMERICA, INC.; )
SPECIALTY TIRES OF AMERICA )
(PENNSYLVANIA), INC.: and )
SPECIALTY TIRES OF AMERICA )
(TENNESSEE), LLC, )
                )
           Plaintiffs, )
                )
           v. )         02: 07-cv-01294
                )
HOOSIER RACING TIRE CORP., and )
DIRT MOTOR SPORTS, INC. d/b/a )
WORLD RACING GROUP, )
                )
           Defendants. )

**ORDER OF COURT**

    **AND NOW**, this 15th day of September, 2009, in accordance with the foregoing

Memorandum Opinion, it is hereby **ORDERED, ADJUDGED AND DECREED** as follows:

    (1)    The Motion for Summary Judgment That Hoosier Has Committed No

Antitrust Violations filed by Hoosier Racing Tire Corp., and joined by  Dirt Motor Sports, Inc.

d/b/a World Racing Group, is **GRANTED**;

    (2)    The Motion for Summary Judgment filed by Dirt Motor Sports, Inc. d/b/a

World Racing Group is GRANTED; and

(3)     The Motion for Partial Summary Judgment filed by Plaintiffs, Race Tire America, Inc., a Division of Speciality Tires of America, Inc.; Speciality Tires of America, Inc.; Specialty Tires of America (Pennsylvania), Inc. and Speciality Tires of America (Tennessee), LLC, is **DENIED AS MOOT.**

The Clerk is ordered to docket this case closed.

BY THE COURT:

s/Terrence F. McVerry
United States District Court Judge

cc:     Alan B. Rosenthal, Esquire
        Babst, Calland, Clements & Zomnir
        Email: arosenthal@bccz.com

        Joseph Decker, Esquire
        Babst, Calland, Clements & Zomnir
        Email: jdecker@bccz.com

        Mark K. Dausch, Esquire
        Email: mdausch@bccz.com

        Mark D. Shepard, Esquire
        Babst, Calland, Clements & Zomnir
        Email: mshepard@bccz.com

        Thomas M. Schultz, Esquire
        Polymer Enterprises, Inc.
        Email: tschultz@polymerenterprises.net

        Aaron M. Staser, Esquire
        Barnes & Thornburg
        Email: astaser@btlaw.com

Deborah E. Pollack-Milgate, Esquire
Barnes & Thornburg
Email: dmilgate@btlaw.com

Donald E. Knebel, Esquire
Barnes & Thornburg
Email: dknebel@btlaw.com

Donna M. Doblick, Esquire
Reed Smith
Email: ddoblick@reedsmith.com

Kendall H. Millard, Esquire
Barnes & Thornburg
Email: kmillard@btlaw.com

Lynn C. Tyler, Esquire
Barnes & Thornburg
Email: lynn.tyler@btlaw.com

Jason E. Hazlewood, Esquire
Reed Smith
Email: jhazlewood@reedsmith.com

John R. Gotaskie , Jr., Esquire
Fox Rothschild LLP
Email: jgotaskie@foxrothschild.com

Theodore H. Jobes, Esquire
Fox Rothschild LLP
Email: tjobes@foxrothschild.com